IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-03109-PAB-MJW

SUSAN L. ESTES,

      Plaintiff,

v.

THOMAS J. VILSACK, Secretary of U.S. Department of Agriculture - Animal and
Plant Health Inspection Service,

      Defendant.

---

**ORDER**

---

This matter is before the Court on the Motion for Summary Judgment [Docket
No. 30] filed by defendant Thomas J. Vilsack, Secretary of the United States
Department of Agriculture ("USDA").  The Court has subject matter jurisdiction pursuant
to 28 U.S.C. § 1331.

**I.  BACKGROUND**[1]

This case arises out of plaintiff Susan L. Estes' employment with the USDA.
Plaintiff was employed as an Administrative Officer ("AO") in the Western Region of the
USDA's Veterinary Services ("Western Region") in Fort Collins, Colorado.  The
Veterinary Services is a subagency of the USDA's Animal Plant Health Inspection
Service ("APHIS").  Plaintiff worked for the USDA as an AO from 2001 until her
retirement on December 31, 2010.

---

[1]The following facts are undisputed unless otherwise indicated.

In 2005, Ben Murphy, an APHIS Classification Specialist, conducted a review of all administrative positions within Veterinary Services, evaluating the daily duties of managers, state directors, and regional directors.[2]   Docket No. 31-3 at 27 (Murphy Dep. 20:10-18).[3]   As part of this process, Ben Murphy reviewed the AO[4] position Ms. Estes encumbered at the Western Region.  *Id.* (Murphy Dep. 19:11-14).  Ben Murphy testified that his review of Ms. Estes' position was similar to his other administrative reviews and was not a desk audit.[5]  *Id.*  After reviewing Ms. Estes' AO position, Ben Murphy concluded that the position Ms. Estes encumbered was appropriately classified at level

---

[2]APHIS has a Classification Unit that is responsible for position descriptions and classification decisions for all positions within APHIS.  Docket No. 30-5 at 1.  The Classification Unit is located in Minneapolis, Minnesota and makes classification decisions for APHIS' Western and Eastern Regions.  Docket No. 30-7 at 14 (McCluskey Dep. 105:2-7).  Within the Classification Unit, Classification Specialists are responsible for writing position descriptions, which outline the duties of a particular position by providing information, such as where the position is located and to whom the incumbent of the position reports.  Docket No. 30-5 at 2, ¶¶ 6-8.

[3]The Section Chief for the Classification Unit in 2005 was Dan Murphy.  This Order will note this difference by including the first names of these individuals (e.g., Ben Murphy or Dan Murphy).  However, all citations to deposition transcripts refer only to Ben Murphy's deposition.

[4]The AO for the Western Region reports to the Regional Director and provides services in connection with the budget, financial management, human capital management, information technology, and all administrative facets of emergency response during animal disease outbreaks.  Docket No. 30-6 at 50; Docket No. 31-2 at 29.

[5]Darcy Long, the Section Chief of the Classification Unit between April 2006 and August 2008, testified that a desk audit is different from a reclassification decision.  Docket No. 30-4 at 17 (Long Dep. 87:7-9).  A desk audit is a process by which a federal employee challenges the pay grade of his or her position.  *Palermo v. Clinton*, 457 F. App'x 577, 578 (7th Cir. 2012).  This is sometimes called an "accretion-of-duties" promotion because the desk audit is meant to trigger a promotion to match the employee's accretion of duties over time.  *See Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009).

13 of the General Schedule pay scale ("GS-13").[6]  *Id*. at 28 (Murphy Dep. 24:10-11); *id*.

at 30 (Murphy Dep. 30:3-4); Docket No. 30-7 at 13 (McCluskey Dep. 104:4-8).

Dr. Jose Diez, the Regional Director for the Western Region in 2005, asked Ben

Murphy for help in developing a new AO position description for the Western Region

classified at a GS-14 level.  Docket No. 31-3 at 28 (Murphy Dep. 24:22-25:4).  With Ben

Murphy's help, Dr. Diez wrote a position description for a new AO position for the

Western Region and gave the position description to Ben Murphy for classification.  *Id*.

(Murphy Dep. 24:11-17).  Ben Murphy classified the new position description at a GS-

14 level.  Docket No. 31-6 at 18 (00064).  The position generally involved providing

administrative, budgetary, and financial management analysis services, as well as all

administrative facets of emergency response, during animal disease outbreaks.  Docket

No. 30-6 at 54.  The position description Ben Murphy approved was not tied to a

specific individual, Docket No. 31-3 at 28 (Murphy Dep. 25:14-20), and, in order to fill

the newly approved GS-14 AO position, the Western Region had to advertise the

position competitively.  *Id*. at 30 (Murphy Dep. 30:3-9).  Ben Murphy testified that, to his

knowledge, the new GS-14 AO position for the Western Region was never

competitively advertised.  *Id*.; *see also* Docket No. 30-4 at 12 (Long Dep. 64:16-19).

In November 2005, shortly after approving the GS-14 AO position description for

the Western Region, Ben Murphy left the Classification Unit.  Docket No. 31-4 at 4.  In

April 2006, Darcy Long took over from Dan Murphy as Section Chief of the

_____

[6]Pursuant to 5 U.S.C. § 5343, the Office of Personnel Management sets
employee salaries for federal employees which are consistent with the public interest
and in accordance with prevailing rates.  Government employees are compensated
based on a General Schedule which includes step and level increases.

Classification Unit.  Docket No. 30-4 at 4 (Long Dep. 33:5-6).  As Section Chief, Ms.

Long was responsible for all of APHIS' final position descriptions, as well as overseeing

a team of Classification Specialists.  Docket No. 30-5 at 1, ¶¶ 4-5.

In June 2006, the Western Region submitted an SF-52 form requesting that the

Classification Unit initiate a personnel action.[7]  Docket No. 30-4 at 4 (Long Dep. 33:5-9).

Dr. Diez sent the SF-52 form to the Classification Unit asking that it issue a vacancy

announcement for the Western Region's newly created GS-14 AO position.  Docket No.

30-5 at 2, ¶ 13; Docket No. 30-6 at 10 (000983).  David Zingler, an APHIS Classification

Specialist, received the Western Region's SF-52 form.[8]  Docket No. 30-6 at 1, ¶¶ 2-3.

Although Mr. Zingler initially took steps to approve the SF-52 request, Ms. Long decided

---

[7]An SF-52 is an Office of Personnel Management form which agency managers complete when requesting that the Classification Unit perform a particular employee action, such as promoting an employee or initiating recruitment for a position.  *See, e.g.,* Docket No. 30-8 at 28 (SF-52 form); Docket No. 30-5 at 2, ¶¶ 12-13.

[8]Plaintiff disputes this fact and argues that Mr. Zingler was not a Classification Specialist in June 2006.  Docket No. 31 at 4.  In support, she cites Ben Murphy's deposition testimony in which Ben Murphy testified that Mr. Zingler was not a Classification Specialist when Ben Murphy worked for the Classification Unit.  Docket No. 31-3 at 30 (Murphy Dep. 32:1-4).  However, because Ben Murphy left APHIS in November 2005, Docket No. 31-4 at 4 (00130), Ben Murphy's testimony does not rebut Mr. Zingler's attestation that he was a Classification Specialist in June 2006.  Docket No. 30-6 at 1, ¶ 2.  Moreover, Ms. Long testified that Mr. Zingler was a Classification Specialist in 2006 when she became the Section Chief.  Docket No. 31-3 at 4 (Long Dep. 23:1-24:14).  Although plaintiff cites Ms. Long's deposition testimony wherein Ms. Long testified that Mr. Zingler did not perform a desk audit while she was the Section Chief, Docket No. 31-3 at 11 (Long Dep. 66:14-17), this testimony does not show that Mr. Zingler was not a Classification Specialist in 2006, but only that he did not perform a desk audit during that time.  Thus, the evidence on which plaintiff relies does not raise a genuine dispute of fact regarding Mr. Zingler's position as a Classification Specialist in June 2006.  *See Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (noting that an issue is "genuine" only if it might lead a reasonable jury to draw an inference in plaintiff's favor)

to delay the vacancy announcement because of the possible ramifications a GS-14 AO position would have for other subagencies within APHIS.  Docket No. 30-4 at 5 (Long Dep. 35:12-17); Docket No. 30-5 at 3, ¶¶ 15-19.  To Ms. Long, the SF-52 request raised a red flag because she was not aware of any other AO positions within APHIS classified at a GS-14 level.  Docket No. 30-4 at 6 (Long Dep. 36:11-13); *id*. at 7 (Long Dep. 39:9-12); *id*. at 14 (Long Dep. 76:22-25); Docket No. 30-5 at 3, ¶ 21.  Moreover, Ms. Long testified that approving a GS-14 AO position would be precedential in that, if a GS-14 AO position was approved for the Western Region of Veterinary Services, the Eastern Region of Veterinary Services as well as other groups within APHIS would request an AO position at a GS-14 level.  Docket No. 30-4 at 15 (Long Dep. 77:2-10) Docket No. 30-5 at 3, ¶¶ 22-24; Docket No. 30-6 at 14-15 (001050-001051).

Once Ms. Long decided to delay the Western Region's SF-52 request, she instructed Classification Specialists Zingler, Thomas Lehner, and David Ehnstrom to review Ben Murphy's classification decision and contact the Western Region for additional information.  Docket No. 30-5 at 3, ¶ 23; Docket No. 30-4 at 7-8 (Long Dep. 39:24-40:3).  In addition, Ms. Long contacted Ben Murphy to discuss his classification decision for the newly created GS-14 AO position.  *Id*. at 8 (Long Dep. 40:7-13).  Ms. Long testified that she wanted to talk to Ben Murphy because his description of the new position did not include an evaluation report, as well as other "supporting docum[entation]."[9]  *Id*.

---

[9]An evaluation report describes how a Classification Specialist reviewed a position description and reached a classification decision.  Docket No. 30-4 at 8-9 (Long Dep. 40:17-41:2).

During their meeting, Ben Murphy told Ms. Long that he did not write an evaluation report for the Western Region's AO position because Dan Murphy, his supervisor in 2005, did not require a completed evaluation report.  Docket No. 31-3 at 29 (Murphy Dep. 27:18-23).  In addition, Ben Murphy said that it was "customary" to create an evaluation report for positions that were GS-15 or higher, but not for positions at a lower grade level.  *Id*. (Murphy Dep. 28:2-5).  Ben Murphy also testified that he felt pressure to retract his classification decision because it was allegedly "controversial," but he stood by his classification of the new GS-14 AO position, *id*. at 31 (Murphy Dep. 37:19-24); Docket No. 31-4 at 4, and that this was the first and only time any of his classification decisions had been challenged.  Docket No. 31-3 at 32 (Murphy Dep. 41:6-9).

Because Ben Murphy did not write an evaluation report, Ms. Long asked Mr. Zingler to review the position description for the Western Region's new GS-14 AO position and to write an evaluation report in support of the classification.[10]  Docket No. 30-5 at 4-6, ¶¶ 34, 37, 39, 48.  Ms. Long states in her affidavit that she believed an evaluation report was necessary in the event that an employee filed an OPM appeal.

_____

[10]Ms. Long states in her affidavit that, as the Section Chief of the Classification Unit, she had the authority to have the classification reviewed in light of her assessment of the business needs of the agency.  Docket No. 30-5 at 4, ¶ 35.  Ms. Long testified that, although evaluation reports were not required for positions lower than a GS-15 level, it was her "desire" to have her subordinates draft evaluation reports for all classification decisions because the evaluation reports were useful in case of an Office of Personnel Management ("OPM") appeal or if the Classification Specialist was no longer available.  Docket No. 30-4 at 8-9 (Long Dep. 40:17-41:2)

*Id*. at 5, ¶ 38.[11]  Ms. Long further states that she was concerned that an incorrect

classification decision for the Western Region's GS-14 AO position would result in

APHIS overcompensating an employee or, worse, would create a domino effect across

APHIS as other regions and programs pursued reclassification for their AO positions.

*Id*. at ¶¶ 40-42.  Ms. Long thought that allowing an incorrect classification decision to

stand was not a good business decision and could undermine the purpose of the

Classification Unit, which is to ensure the accuracy of position descriptions and to

ensure that all employees are properly classified.  *Id*.; *see also* Docket No. 30-6 at 14-

15 (001050-001051).

After Mr. Zingler requested clarification from the Western Region about the

duties the new AO would perform at a GS-14 level, Docket No. 30-6 at 11 (000985), the

Western Region responded that the new AO position's duties were accurately

described in Dr. Diez's position description.  *Id*. at 10 (000983).  Ms. Estes testified that

her three Associate Directors at the time, Dr. Jerry Diemer, Dr. Mark Davidson, and Dr.

Stephen Scott, supported efforts to create a GS-14 AO position for the Western

Region.[12]  Docket No. 30-2 at 19 (Estes Dep. 31:16-22).  Ms. Long states in her affidavit

that, although the Western Region wished to proceed with the GS-14 AO position, she

---

[11]If an employee or supervisor disagrees with the classification decision made by a Classification Specialist, he or she may seek review of a classification by filing an appeal with the United States Office of Personnel Management ("OPM").  Docket No. 30-5 at 2, ¶ 11.

[12] At some point in 2006, Dr. Diez was transferred to the national office for Veterinary Services, at which time the three Associate Regional Directors rotated as acting Regional Director.  Docket No. 30-2 at 20-21 (Estes. Dep. 33:15-22, 34:4-7).  Thus, although Dr. Diez submitted the SF-52 request, he was not the Regional Director of the Western Region when Ms. Long delayed approval of the SF-52 request.

did not believe that it was in APHIS' best interest to accept Ben Murphy's classification decision and, therefore, ordered a review of the GS-14 AO position description.[13] Docket No. 30-5 at 6, ¶¶ 47-48.

In June 2006, Mr. Zingler reviewed Ben Murphy's classification decision by applying APHIS' Evaluation Statements, Docket No. 30-6 at 17-20 (001057-001060), Position Classification Flysheets for the GS-0341 Series, *id.* at 22-26 (001066-001070), and the Administrative Analysis Grade Evaluation Guide, *id.* at 28-48 (001071-001092), to the position description for the newly created GS-14 AO position. *Id.* at 3-4, ¶¶ 20-26. After performing his review, Mr. Zingler concluded that the position description written by Dr. Diez for the Western Region's AO position should be reclassified at a GS-13 level. *Id.* at 4, ¶ 27. Based on Mr. Zingler's review, the Classification Unit also identified certain discrepancies in Ben Murphy's classification decision. Docket No. 30-6 at 14-15 (001050-001051). In addition, Jim Duoos, the Branch Chief for the Classification Unit, recommended keeping the Western Region's AO position at a GS-13 level. *Id.* (001050). Similarly, Karen Benham, Director of Human Resources for APHIS' Marketing and Regulatory Programs, suggested that a GS-14 level designation

_____

[13]Ms. Long states in her affidavit that, although the Western Region's management thought that Ben Murphy's classification decision was justified, the Western Region did not have the authority to make such a change without approval from the Classification Unit. Docket No. 30-5 at 6, ¶¶ 46-47. Ms. Long states that individual managers can request changes to position descriptions, but only the Classification Unit has the authority to finalize the change. *Id.* at 2, ¶¶ 8-9. Similarly, Dr. Brian McCluskey, the Regional Director of the Western Region after April 2007, testified that all classification decisions for the Western and Eastern Regions are performed by the Classification Unit in Minneapolis, Minnesota. Docket No. 30-7 at 14 (McCluskey Dep. 105:2-7). Dr. McCluskey states in his affidavit that he did not have the authority to make changes to the classification of the AO position for the Western Region. Docket No. 30-1 at 2, ¶ 16.

was not warranted for the Western Region's AO position.  *Id.*  Accordingly, on June 30,

2006, Mr. Zingler submitted his evaluation report wherein he explained his rationale for

classifying Dr. Diez's position description for the Western Region's AO position at a GS-

13 level.  *Id.* at 50-61 (000995-001034).

Ms. Long reviewed Mr. Zingler's evaluation report and concluded that it was

complete and accurate.  Docket No. 30-4 at 3 (Long Dep. 31:7-17).  Ms. Long then

emailed the Western Region to tell them that she had reclassified the AO position

approved by Ben Murphy as a GS-13 level position.  Docket No. 30-6 at 63 (000994).

Ms. Long's email explained that, because Ben Murphy's classification decision did not

have an evaluation report, she decided to perform an independent review of the

position description in the event of an OPM appeal.  *Id.*  On August 2, 2006, Dr.

Davidson responded to Ms. Long's email seeking a clarification of the Classification

Unit's decision.  *Id.* at 64-65 (000999-001000).  In response, Mr. Zingler and Mr. Lehner

prepared a clarification of the evaluation report, *id.* at 67-69 (001054-001056), which

was sent to the Western Region.  *Id.* at 7, ¶ 37.  Because the Classification Unit

reclassified the Western Region's AO position back to a GS-13 level, the SF-52 request

was effectively mooted and the new GS-14 AO position approved by Ben Murphy was

never competitively advertised.  Docket No. 30-4 at 12 (Long Dep. 64:16-19).

Ms. Estes disagreed with the Classification Unit's decision.  Docket No. 30-2 at

21 (Estes Dep. 34:8-10).  Ms. Estes testified that she believed the position description

was intentionally manipulated because of emails she saw between Ms. Long and her

supervisors, which directed Ms. Long to "find something" to keep the Western Region's

9

AO position at a GS-13 level.  *Id*. at 35 (Estes Dep. 56:20-24).  Ms. Estes testified that

the Classification Unit's evaluation report was incorrect because it contained lies,

outright misrepresentations, and glaring deficiencies.  *Id*. at 24 (Estes Dep. 38:2-7).

Specifically, Ms. Estes testified that the Classification Unit made misrepresentations

about the definition of an executive agency and citations to an OPM decision.  Docket

No. 31-2 at 7 (Estes Dep. 55:1-20).  Ms. Estes, however, did not file an OPM appeal,

Docket No. 30-2 at 21 (Estes Dep. 34:11-20), and neither did Dr. Davidson, Dr. Diemer,

or Dr. Scott.  *Id*.  Ms. Estes also did not request a desk audit.  *Id*. at 26 (Estes Dep.

40:10-18).  Instead, Ms. Estes chose to wait for the appointment of a new Regional

Director to pursue the reclassification issue.  *Id*. at 24 (Estes Dep. 38:13-18).

In April 2007, Dr. Brian McCluskey became the Regional Director for the

Western Region.  Docket No. 30-2 at 22 (Estes Dep. 35:10-15).  Dr. McCluskey did not

support Ms. Estes' attempts to reclassify the Western Region's AO position to a GS-14

level because he believed the GS-13 classification was appropriate.  Docket No. 30-7 at

11 (McCluskey Dep. 102:21-103:1); Docket No. 31-2 at 4 (Estes Dep. 35:24-36:2).

Although Dr. McCluskey did not support her reclassification efforts, Ms. Estes testified

that Dr. McCluskey did not discriminate against her based on her sex.  Docket No. 30-2

at 40 (Estes Dep. 70:9-17).

In May 2010, Ms. Estes learned that James Stewart, an AO for the Eastern

Region's Plant Protection and Quarantine ("PPQ") division, received compensation at a

GS-14 level.  Docket No. 30-2 at 30-31 (Estes Dep. 47:23-48:8).  Mr. Stewart testified

that his position description was upgraded from a GS-13 to a GS-14 level after he filed

two complaints with Equal Employment Opportunity ("EEO") counselors.  Docket No.

30-8 at 2 (Stewart Dep. 61:9-13).  Mr. Stewart filed his first complaint on August 6,

2007, which resulted in a settlement agreement with the USDA signed in January 2008.

Docket No. 30-8 at 7-11 (000957-000961).  As part of the 2008 settlement agreement,

the USDA promised to provide Mr. Stewart with assistance in rewriting his position

description, rescinding a letter of instruction issued against him, restoring 200 hours of

sick leave, and providing Mr. Stewart with a $4500.00 recognition award.[14]  *Id*. at 7-8

(000957-000958); *id*. at 1 (Stewart Dep. 58:11-17).

  After the 2008 settlement agreement, Mr. Stewart drafted and submitted a new

position description to the Classification Unit with the help of Kristen Luurs, Mr.

Ehnstrom, and Vic Harabin, Regional Director of the Eastern Region's PPQ division.

Docket No. 31-3 at 21 (Stewart Dep. 103:1-7).  Mr. Stewart hoped that the

Classification Unit would find that his new position description qualified as a GS-14 level

position.  *Id*. (Stewart Dep. 103:13-24); *id*. (Stewart Dep. 104:15-25).  On September

30, 2008, Mr. Stewart sent an email to Ms. Long, Michele Stegall, a supervisor at the

Classification Unit, and Kristen Luurs complaining that no action had been taken on his

recently submitted position description and requesting some feedback.  Docket No. 31-

4 at 6-7 (003723-003724).  *Id*.

  In October 2008, Mr. Stewart filed a second complaint with EEO counselors.

Docket No. 30-8 at 2 (Stewart Dep. 61:9-11).  Mr. Stewart's second EEO complaint was

based on the USDA's failure to process the rewritten position description he submitted.

*Id*. (Stewart Dep. 61:21-22).  Specifically, Mr. Stewart complained that, once he

---

[14]Pursuant to the settlement agreement, Kris Luurs was assigned to help Mr.
Stewart rewrite his position description.  Docket No. 30-8 at 8 (000958).

submitted a new position description, the Classification Unit did not evaluate the

position description to determine the appropriate grade level. *Id.* at 3 (Stewart Dep.

62:12-15). Mr. Stewart's second EEO complaint resulted in a second settlement

agreement with the USDA signed in August 2009. Docket No. 30-8 at 24-27 (00934-

000937). As part of the 2009 settlement agreement, Mr. Stewart's position description

was retroactively classified at a GS-14 level and he received 100 hours of sick leave, 80

hours of annual leave, and a cash award of $3500.00. *Id.* at 24 (000934). The

settlement agreement attached a position description, Docket No. 30-8 at 14-23

(00163-00172), and a position description cover sheet signed by Mandy Olson, a

Classification Specialist. *Id.* at 12-13 (00161-00162).

On May 14, 2010, Ms. Estes filed a Freedom of Information Act ("FOIA") request

for information about Mr. Stewart's position description. Docket No. 12-2 at 1. On June

8, 2010, Ms. Estes received the information she requested through her FOIA request.

Docket No. 12-2 at 2. On June 28, 2010, plaintiff contacted an EEO counselor and

complained of discrimination on the basis of age, sex, and retaliation. Docket No. 12-2

at 3. On October 28, 2010, plaintiff filed a formal charge of discrimination with the

Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a final agency

decision on September 12, 2011. *See* Docket No. 12-3. On November 29, 2011,

plaintiff commenced this action alleging that she was subject to: (1) gender

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.*; (2) retaliation in violation of Title VII; and (3) discrimination in

violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et*

*seq*. Docket No. 1 at 7-9.

On February 3, 2012, defendant filed a motion to dismiss all of plaintiff's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Docket No. 8.  On September 27, 2012, the Court issued an Order [Docket No. 21] granting defendant's motion in part and denying the motion in part.  Docket No. 21 at 14.  The Court dismissed plaintiff's retaliation and age discrimination claims for failure to state a claim.  *Id*.  Consequently, only plaintiff's gender discrimination claim remains.  *Id*.  In the present motion, defendant requests that the Court enter summary judgment on plaintiff's remaining claim.  Docket No. 30.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

13

### III.  ANALYSIS

### A.  Timeliness of Title VII Claim

Defendant argues that the Court should analyze plaintiff's claim as a failure to promote claim, and not as a wage discrimination claim.  Docket No. 30 at 12. Defendant asserts that, because the crux of plaintiff's claim is that a male employee, Mr. Stewart, received a position upgrade and plaintiff did not, plaintiff's claim is more appropriately labeled as a failure to promote claim.  *Id*. at 12-13; Docket No. 30-2 at 39 (Estes Dep. 69: 24-25).  In addition, defendant contends that, because plaintiff's claim is more appropriately considered a failure to promote claim, she is time barred from raising it since she did not exhaust her administrative remedies.  Docket No. 30 at 12. Moreover, defendant claims that, because plaintiff's failure to promote claim arises out of a discrete employment decision, the Lilly Ledbetter Fair Pay Act ("Ledbetter Act"), Pub. L. No. 111-2 (2009), 42 U.S.C. § 2000e-5(e)(3)(A), does not alter the accrual period for plaintiff's claim.  *Id*. at 13-14.  The Court disagrees.

First, it is undisputed that Ben Murphy did not perform a desk audit of Ms. Estes' position.  Docket No. 31-3 at 27 (Murphy Dep. 20:10-18).  Second, Ben Murphy said in his affidavit that the new GS-14 AO position was not the equivalent of an accretion of duties promotion.  Docket No. 31-4 at 4 (00130).  Third, it was Dr. Diez, and not plaintiff, who sought to create a new AO position classified at a GS-14 level.  Docket No. 31-3 at 28 (Murphy Dep. 24:22-25:4).  Thus, because plaintiff did not ask for a promotion through a desk audit and plaintiff was not considered for a promotion since the new GS-14 AO position was never competitively advertised, there is no support for

the proposition that plaintiff raises a failure to promote claim.

As will be discussed below, plaintiff's arguments regarding Ms. Long's decision to reclassify Dr. Diez's position description to a GS-13 level may appear to raise a failure to promote claim.  However, the Court finds that plaintiff's claim has always been that, in 2010, she discovered that a male employee, Mr. Stewart, received compensation at a higher grade level for doing substantially the same work.  Docket No. 30-2 at 33 (Estes Dep. 51:7-8).  As such, the Court finds that plaintiff adequately raises a wage discrimination claim because she contends that she "receive[d] less pay than [a] similarly situated colleague[ ] – that is, unequal pay for equal work."  *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1175 (10th Cir. 2011).  Thus, because Ms. Estes appropriately raises a wage discrimination claim, the next question is whether she filed a timely charge of discrimination.[15]

Under Title VII, a plaintiff must exhaust his or her administrative remedies for each individual discriminatory or retaliatory act.  *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  A federal employee asserting an employment discrimination claim "must initiate contact with a[n] [Equal Employment Opportunity] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of

---

[15]Because the Court finds that plaintiff does not raise a failure to promote claim, the Court will not discuss whether defendant waived the statute of limitations defense when it accepted Ms. Estes' charge of discrimination and issued a Final Agency Decision, Docket No. 12-3, without raising the statute of limitations issue.  *See, e.g., Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) (noting that "when the agency decides [an EEO complaint] on the merits without addressing the untimeliness defense" the agency waives this defense in subsequent litigation); *Ester v. Principi*, 250 F.3d 1068, 1071-72 (7th Cir. 2001) (noting the same); *but see Rowe v. Sullivan*, 967 F.2d 186, 191 (5th Cir. 1992) (noting that "[i]n order to waive a timeliness objection, the agency must make a specific finding that the claimant's submission was timely").

personnel action, within 45 days of the effective date of the action." 29 C.F.R.
§ 1614.105(a)(1). If the matter is not resolved within thirty days, the EEO counselor
must issue a notice informing the employee of her right to file a formal discrimination
complaint with the employing agency within 15 days of receiving the notice. *Id.* at 29
C.F.R. § 1614.105(d). Once a complaint is filed, the agency has 180 days to
investigate the allegations. 29 C.F.R. § 1614.106(e)(2). The employee may appeal the
final determination of the agency to a federal district court within ninety days of the
receipt of the final agency action or 180 days after filing the formal complaint if no
action is taken by the agency. 29 C.F.R. § 1614.407.

Under the Ledbetter Act, each paycheck issued pursuant to a discriminatory pay
structure creates an independent, actionable employment practice. *See* 42 U.S.C.
§ 2000e-5(e)(3)(A) ("For purposes of this section, an unlawful employment practice
occurs, with respect to discrimination in compensation in violation of this subchapter . . .
when an individual is affected by application of a discriminatory compensation decision
or other practice, including each time wages, benefits, or other compensation is paid");
*Almond*, 665 F.3d at 1182-83. Here, Ms. Estes submitted her FOIA request on May 14,
2010, Docket No. 12-2 at 1; on June 8, 2010, Ms. Estes received the information she
requested through her FOIA request, Docket No. 12-2 at 2; on June 28, 2010, she filed
a formal charge of discrimination and received a Final Agency Decision on September
12, 2011, Docket No. 12-3; and, on November 29, 2011, plaintiff filed the present case.
Docket No. 1. Based on the foregoing, the Court finds that Ms. Estes filed a timely
charge of discrimination and exhausted her administrative remedies with regard to her
wage discrimination claim. *Martinez*, 347 F.3d at 1211. Thus, Ms. Estes is not

16

time-barred from raising her wage discrimination claim here.

### B.   Gender Discrimination

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff argues that she was subject to discrimination because of her sex.  Docket No. 31 at 13.  Specifically, plaintiff claims that she was paid less than a similarly situated employee, Mr. Stewart, for doing substantially the same work.  Docket No. 30-2 at 33 (Estes Dep. 51:7-8); *id.* at 37 (Estes Dep. 58:11-16); *id.* at 39-40 (Estes Dep. 69:22-70:4).

Where there is no direct evidence of discrimination, as is the case here, plaintiff must rely on the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 636 (10th Cir. 2012) (noting that *McDonnell Douglas* applies to wage discrimination claims).  Under the *McDonnell Douglas* framework, Ms. Estes bears the burden of establishing a prima facie case of discrimination by showing that (1) she is a member of a protected class and (2) she occupied a position similar to that of a higher paid male employee, in this case, Mr. Stewart.  *Id*; *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).  If Ms. Estes can make such a showing, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the wage disparity.  *Id*.  If defendant meets its burden, then it is entitled to summary judgment unless Ms. Estes can show that there is a genuine dispute of material fact demonstrating that defendant's proffered nondiscriminatory reason is a pretext for

unlawful discrimination.  *Id.*  That is, "plaintiff must show that 'a discriminatory reason more likely than not motivated [the employer] to pay her less.'"  *Sprague v. Thorn Ams., Inc.,* 129 F.3d 1355, 1363 (10th Cir. 1997) (citation omitted); *accord Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306 (10th Cir. 2005).

### 1.  *Prima Facie Case*

As a threshold matter, the Court notes that it is difficult to understand how plaintiff can maintain that she was the victim of wage discrimination for a position that was never competitively advertised and which she never encumbered.  Ben Murphy testified that Ms. Estes encumbered an AO position classified at a GS-13 level.[16] Docket No. 31-3 at 28 (Murphy Dep. 24:10-11); *id*. at 30 (Murphy Dep. 30:3-4).  In addition, it is undisputed that Dr. Diez, with the help of Ben Murphy, wrote a new position description that Ben Murphy classified as an AO position at a GS-14 level.  *Id*. at 28 (Murphy Dep. 24:11-17).  Ben Murphy testified that the newly created GS-14 AO position was not tied to a specific individual, *id*. (Murphy Dep. 25:14-20), and that, in order to fill the new GS-14 AO position, the Western Region had to advertise the position competitively.  *Id*. at 30 (Murphy Dep. 30:3-9).  Moreover, Ben Murphy sent an email to Dr. Diez advising Dr. Diez to coordinate with the Eastern Region before starting

---

[16]Plaintiff argues that she actually encumbered a GS-14 AO position; however, Ben Murphy, the person who created the position, testified to the contrary and Ms. Estes has provided no evidence to contradict Ben Murphy's testimony.  *See Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (noting that an issue is "genuine" only if it might lead a reasonable jury to draw an inference in plaintiff's favor).  In fact, Ms. Estes relies primarily on Ben Murphy's testimony to support her claim.  Accordingly, because Ben Murphy's deposition testimony contradicts Ms. Estes' claim, the Court finds that it is undisputed that Ms. Estes did not encumber a GS-14 AO position in 2006.

the competitive recruitment process for the newly created GS-14 AO position.  Docket No. 31-6 at 18 (00064).  However, when the Western Region filed an SF-52 request for a vacancy announcement, Ms. Long rejected Ben Murphy's classification decision and found that Dr. Diez's position description was properly classified as a GS-13 level position.  Crucially, there is no evidence that Ms. Long or anyone else in the Classification Unit knew or thought that the new GS-14 AO position was tied to Ms. Estes, which in part indicates why they never tried to contact Ms. Estes during the review process.  In addition, there is no evidence showing that plaintiff necessarily would have been appointed to the new GS-14 AO position, given that the newly created GS-14 AO position had to be competitively advertised.

Thus, plaintiff's discrimination claim is tantamount to an assertion of wage discrimination based on defendant's failure to approve a position that plaintiff never actually encumbered.  Based on the foregoing, the Court doubts that Ms. Estes can raise a claim of wage discrimination based on Ms. Long's reclassification decision.  *Cf. Sprague*, 129 F.3d at 1362 (noting that "[i]t is indeed difficult for us to understand how Sprague can maintain that she was the victim of discrimination due to Thorn's refusal to promote her to the position of assistant manager of jewelry when such position did not even exist").  This fact alone is sufficient to grant defendant summary judgment.  However, the Court will assume that Ms. Estes' claim is not so attenuated and instead that Ms. Estes argues that defendant's decision to compensate Mr. Stewart at a GS-14 level, while Ms. Estes was paid at a GS-13 level, constitutes wage discrimination on the basis of her gender.  Thus, the appropriate inquiry is not why Ms. Long chose to reclassify Dr. Diez's GS-14 AO position, but rather whether defendant's decision to pay

19

Mr. Stewart at a GS-14 level raises an inference of discrimination based on sex.

Under this understanding of plaintiff's claim, the Court finds that plaintiff has established a prima facie case of wage discrimination under Title VII. First, it is undisputed that, as a female, plaintiff is a member of a protected class. Second, plaintiff has provided evidence that raises a genuine dispute of material fact as to whether she occupied a similar position to Mr. Stewart. Plaintiff argues that she compared her position description with Mr. Stewart's position description and concluded that both she and Mr. Stewart had similar duties in that all AOs provide financial forecasts, guidance and advice on strategies and techniques, and resource distribution. Docket No. 31-2 at 12-14. Moreover, Ms. Estes found that she serviced an area similar in size to Mr. Stewart and that both she and Mr. Stewart had similar supervisory and management tasks. *Id*.

Defendant argues that Ms. Estes cannot show that she is similarly situated to Mr. Stewart because Mr. Stewart is not the right comparator. Instead, defendant contends that Randy Snyder, the AO for Veterinary Services in the Eastern Region, who was also compensated at a GS-13 level, is the appropriate comparator for Ms. Estes. Docket No. 30-2 at 32 (Estes Dep. 49:1-19). Defendant claims that, because Mr. Snyder worked in the Eastern Region in the same position as Ms. Estes, he necessarily had the same duties and responsibilities and worked in the same field (i.e., animals) as Ms. Estes. By contrast, defendant asserts that Mr. Stewart worked in a different field (i.e., plants) and necessarily performed different duties. In addition, defendant claims that Ben Murphy concluded that Ms. Estes encumbered a position properly classified at a GS-13 level, Docket No. 31-3 at 28 (Murphy Dep. 24:10-11), while another

20

Classification Specialist found that Mr. Stewart's position description qualified for compensation at a GS-14 level and that the opinion of a Classification Specialist is entitled to more weight than Ms. Estes' own unqualified opinion.  However, because the focus of the similarly situated inquiry is not on the labels employers choose to give a particular position, but rather on "the duties [plaintiff] actually performed," *Daniels*, 701 F.3d at 637, the Court finds that plaintiff's individual analysis of Mr. Stewart's position description is sufficient to raise a triable issue of fact regarding whether she had the same experience and array of responsibilities and performed similar functions to Mr. Stewart.  *Sprague*, 129 F.3d at 1363.  The Court recognizes that Ms. Estes is not a Classification Specialist, but nevertheless, her individual analysis of the position description raises a genuine dispute of material fact as to whether she performed substantially the same work as Mr. Stewart.  *Mickelson*, 460 F.3d at 1311.

## 2. Legitimate Nondiscriminatory Reason

Defendant presents two reasons to show that its compensation decision is based on legitimate nondiscriminatory factors.  First, defendant argues that it performed an independent review of Ben Murphy's classification decision to ensure the accuracy and consistency of position descriptions across APHIS' subagencies.  Docket No. 30-5 at 5-6, ¶¶ 41-42, 47.  Specifically, Ms. Long was concerned about the ripple effects a GS-14 AO position in the Western Region could have on other APHIS subagencies.  *Id*. at 5, ¶ 41.  In addition, Ms. Long wanted to ensure that, if she approved a GS-14 AO position, it was based on a correct position description supported by an evaluation report.  *Id.* at 6, ¶ 47.  Second, defendant claims that it chose to settle Mr. Stewart's

EEO complaint because it determined that it was in the USDA's best interest to settle in light of the costs associated with litigation.  Docket No. 34 at 14.  The Court finds that defendant has identified legitimate nondiscriminatory reasons for its compensation decisions, namely, uniformity and consistency of position descriptions across APHIS agencies and saving costs in light of the risks associated with litigation.

### 3.  Pretext

To show pretext, plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for" its compensation decision.  *See Crowe v. ADT Security Servs.*, Inc., 649 F.3d 1189, 1196 (10th Cir. 2011).  That is, plaintiff must show that defendant, regardless of the proffered reasons, likely relied on discriminatory animus to pay her a lower salary.  *Jaramillo*, 427 F.3d at 1306.  To show pretext, plaintiff relies on three theories: (1) procedural irregularities and deficiencies with Ms. Long's review of Ben Murphy's classification decision; (2) Mr. Stewart received favorable treatment from defendant as EEO counselors helped him draft a position description after he filed his EEO complaint while Ms. Estes did not receive such aid; and (3) Dr. McCluskey's pattern of discriminatory behavior towards women.  The Court finds none of these theories persuasive.

### a.  Ms. Long

Plaintiff raises several arguments based on Ms. Long's actions to show that defendant's stated reason is pretextual:[17] First, Ms. Long's decision to allow Mr. Zingler

---

[17]As noted above, based on the Court's understanding of plaintiff's claim, Ms. Long's decision is irrelevant.  However, in the event that Ms. Long's reclassification

to review Ben Murphy's classification decision was unsound because Mr. Zingler was not a Classification Specialist, Docket No. 31 at 10; second, Ms. Long failed to follow OPM rules, regulations, and standards when she requested an evaluation report when one was not required, *id*.; third, Ms. Long fabricated classification definitions and lied to ensure that Dr. Diez's position description was downgraded to a GS-13 level, *id*. at 11; fourth, Ms. Long and Mr. Zingler could not explain why the classification numbers were omitted from Mr. Stewart's position description sheet or why Mr. Stewart's position description did not have an evaluation statement attached. *Id*. at 12.

With regard to Mr. Zingler, as noted above, none of the evidence plaintiff cites rebuts Mr. Zingler's attestation that he was a Classification Specialist in 2006, Docket No. 30-6 at 1, ¶ 2, or Ms. Long's testimony that Mr. Zingler was a Classification Specialist during the relevant period. Docket No. 31-3 at 4 (Long Dep. 23:1-24:14). Accordingly, the Court finds that plaintiff does not raise any evidence from which a reasonable jury could conclude that Mr. Zingler was not a Classification Specialist in June 2006. *Anderson*, 477 U.S. at 248-50. Moreover, to the extent plaintiff argues that Ms. Long never performed a desk audit or wrote a classification decision, the Court finds that this is irrelevant because, as Section Chief, her duties included overseeing the work performed by Classification Specialists. Docket No. 30-5 at 1, ¶ 5. Whether Ms. Long was qualified for her position is an employment decision that, by itself, is insufficient to give rise to an inference of discrimination. *Simms v. Okla.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (noting that the court is not to act as a "super personnel

decision has some tangential bearing on Mr. Stewart's situation, the Court discusses plaintiff's pretext arguments regarding Ms. Long.

23

department" that second guesses employers' business judgment).

As to the evaluation report, "[e]mployers often fail to follow written policy manuals for benign (sometimes even very sound) business reasons, and in any event [the Court's role] isn't to enforce employment manuals but to protect against unlawful discrimination." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1213 (10th Cir. 2010). (citation omitted).  Hence, not every failure to follow every directive in an employer's policy manual gives rise to an inference of pretext for invidious discrimination.  *Id*.  The evidence is consistent with Ms. Long's testimony that she wanted an evaluation report to ensure that the GS-14 classification was accurate.  The Court is not in a position to question her judgment.  *Simms*, 165 F.3d at 1330.  Moreover, there is no evidence that Ms. Long requested an evaluation report to disadvantage Ms. Estes because of Ms. Estes' gender.  In fact, there is no evidence that Ms. Long was even aware of Ms. Estes in 2006.  Even assuming Ms. Estes' supervisors envisioned that she would fill this new position, there is no evidence that, in 2006, Ms. Long or any other Classification Specialist knew that the GS-14 position was tied to Ms. Estes.  Accordingly, the Court finds that plaintiff has not presented any evidence showing that Ms. Long's request for an evaluation report was a procedural irregularity, let alone an irregularity giving rise to an inference of sex discrimination against plaintiff.  *Johnson*, 594 F.3d at 1211.

Next, plaintiff argues that Ms. Long fabricated classification definitions and lied to ensure that Dr. Diez's position description was downgraded to a GS-13 level.  Docket No. 31 at 11.  Even assuming this fact is true, the Court finds that this evidence does not show that Ms. Long used her resources to keep the AO position at GS-13 based on a hidden discriminatory agenda.  Instead, the evidence in the record shows that Ms.

Long was concerned about the ramifications that a GS-14 AO position would have for all of APHIS' regions and subdivisions.  Docket No. 30-5 at 5, ¶¶ 40-42.  In addition, Ms. Estes admitted that the emails directing Ms. Long to "find something" to keep the position at a GS-13 level were not based on Ms. Estes' sex.  Docket No. 30-2 at 36 (Estes Dep. 57:15-20).  Thus, even assuming Ms. Long took some irregular action to keep the AO position for the Western Region at a GS-13 level, the Court finds that such actions are not sufficient to support an inference of pretext because the evidence shows that Ms. Long had a legitimate, nondiscriminatory reason for her conduct and acted in good faith on that belief.  *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004).  The Court finds that evidence of Ms. Long's desire to keep the AO position at a GS-13 level does not give rise to an inference of discrimination.  *Johnson*, 594 F.3d at 1210.

Finally, plaintiff argues that she can show pretext because Ms. Long and Mr. Zingler could not explain why Mr. Stewart's position description worksheet did not include classification numbers or why Mr. Stewart's position description did not have an evaluation report.  Docket No. 31 at 12, 18.  In her affidavit, Ms. Long states that she left her position as Section Chief of the Classification Unit in August 2008.  Docket No. 30-5 at 1, ¶ 4.  Mr. Stewart's position description is dated October 10, 2008.  Docket No. 31-7 at 20-21 (00161-00162).  Because Ms. Long was no longer in charge of the Classification Unit when Mr. Stewart's position description was classified at a GS-14 level, the fact that it did not include an evaluation report does not raise an inference that Ms. Estes' gender played any role in the decision to keep the AO position for the Western Region at a GS-13 level.  Instead, the evidence shows that Ms. Long did not

know about Mr. Stewart's 2008 position description because she was no longer Section Chief of the Classification Unit when Mr. Stewart settled his 2008 EEO complaint.

In summary, the undisputed evidence shows that Ms. Long made a business decision based on a position description that was not tied to a specific individual.  The Court finds that Ms. Estes fails to raise any genuine inconsistencies, incoherencies, or contradictions with defendant's legitimate nondiscriminatory reason for its compensation decision.  Accordingly, Ms. Estes has not met her burden of showing that defendant's nondiscriminatory reason here is pretext for discrimination.  *Sprague*, 129 F.3d at 1363.

### b.  Mr. Stewart

Ms. Estes argues that defendant's nondiscriminatory reason for its pay disparity is pretextual because, after Mr. Stewart filed his EEO complaint, he received a settlement and assistance from Classification Specialists to draft his position description, while Ms. Estes was not offered such aid.  Docket No. 31 at 18.

A plaintiff may show pretext by providing evidence that she was treated differently from other similarly situated employees.  *Kendrick v. Penske Transp. Servs.*, Inc., 220 F.3d 1220, 1232 (10th Cir. 2000).  To show disparate treatment, a plaintiff must show that she was similarly situated to her comparators in "all relevant respects," and courts traditionally "compare the relevant employment circumstances, such as work history and company policies" to determine whether employees are similarly situated. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (citation omitted).

The only relevant inquiry here is whether plaintiff has provided evidence showing

26

that defendant's stated reason for settling with Mr. Stewart, namely, avoiding the costs

of litigation, is pretextual.  In order to show that defendant was motivated by something

other than cutting costs, plaintiff must demonstrate that she filed an EEO complaint that

was substantially similar to Mr. Stewart's, yet her EEO complaint was handled

differently.  Ms. Estes does not make this showing.  First, plaintiff has introduced no

evidence establishing why Mr. Stewart filed his 2007 EEO complaint.[18]  Without any

evidence about why Mr. Stewart filed his claim of discrimination, a jury would have no

reasonable basis from which to infer that defendant settled with Mr. Stewart, yet did not

do the same with Ms. Estes, simply because of her sex.  Such a conclusion would be

speculative and not based on any admissible evidence.  *See Bausman v. Interstate*

*Brands. Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (noting that the nonmoving party

with the ultimate burden of persuasion must present facts from which a reasonable jury

could infer the presence of each element essential to the case).  In fact, it is illogical to

assume that Mr. Stewart is a proper comparator.  Ms. Estes filed her EEO claim based

on sex discrimination.  Assuming that Mr. Stewart also filed his EEO complaint based

on a claim of sex discrimination, Ms. Estes would be arguing that defendant

simultaneously discriminated against two employees in the same position, but of a

different sex, on the basis of sex.  Such a theory would make no sense.  Moreover,

assuming that Mr. Stewart filed his 2007 EEO complaint on grounds other than sex

---

[18]It is undisputed that Mr. Stewart's 2008 EEO complaint was based on
defendant's failure to implement the 2008 settlement agreement.  Docket No. 30-8 at 2
(Stewart Dep. 61:9-22).  Thus, any claim of disparate treatment must be based on the
2007 EEO complaint that resulted in Mr. Stewart receiving aid from the Classification
Unit.

discrimination, defendant's motivation to settle with him cannot lead to an inference that defendant discriminated in Mr. Stewart's favor on the basis of sex or that defendant's failure to settle with plaintiff was motivated by sex discrimination.

To the extent Ms. Estes claims that the Classification Unit gave Mr. Stewart favorable treatment as it helped him draft a position description, the Court finds that this argument does not sufficiently show pretext because it is undisputed that the Classification Unit did not choose to help Mr. Stewart, but rather was required to do so based on the settlement agreement.  In fact, the evidence in the record shows that defendant did not choose to pay Mr. Stewart more for his work, but rather made this decision in light of the costs of litigation.  The fact that defendant concluded that a settlement with Ms. Estes was not cost-effective, without more, does not raise an inference of discrimination, but rather appears to be a business judgment which the Court should not second guess.  *See Simms*, 165 F.3d at 1330.  Based on the foregoing, the Court finds that Ms. Estes does not present any evidence from which a reasonable jury could conclude that defendant's stated nondiscriminatory reason is unworthy of credence.  *Jaramillo*, 427 F.3d at 1312.  As noted above, to support an inference of pretext, a plaintiff must come forward with evidence that the employer did not really believe its proffered reason for its action and thus may have been pursuing a hidden discriminatory agenda.  *Johnson*, 594 F.3d at 1210.  The Court finds that Ms. Estes has not met that burden here.

### c.  Dr. McCluskey

Plaintiff asserts pretext is established because Dr. McCluskey had a history of

discriminatory behavior towards women.  Docket No. 31 at 18-19.  Specifically, plaintiff claims that several female employees raised complaints about Dr. McCluskey's behavior towards them in the past.  *Id*.  From this evidence, plaintiff argues that a jury could infer that Dr. McCluskey harbored a bias against women that affected his decision making.

To establish pretext from this evidence, however, the Tenth Circuit requires that Dr. McCluskey's actions be "somehow . . . tied to the employment actions disputed in the case at hand."  *Johnson*, 594 F.3d at 1213 (citation omitted).  That is, Dr. McCluskey's actions must have resulted in the Classification Unit's decision to reclassify the position created by Dr. Diez back to GS-13 or resulted in the upgrade of Mr. Stewart's position to GS-14.  *Young v. Dillon Cos, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006).  Ms. Estes' evidence does not establish either fact.

Here, it is undisputed that the Classification Unit had sole authority to change position descriptions or change a position's grade level.  Docket No. 31 at 9-10; Docket No. 30-5 at 6, ¶¶ 46-47; Docket No. 30-1 at 2, ¶ 16.  In addition, it is undisputed that Dr. McCluskey did not play a role in the classification decision regarding Dr. Diez's position description.  Docket No. 30-1 at 2, ¶ 13.  Moreover, Dr. McCluskey had no input or authority over Mr. Stewart.  *Id*. at 3, ¶¶ 23-24; Docket No. 30-2 at 34 (Estes Dep. 52:4-8).  Furthermore, plaintiff testified that Dr. McCluskey did not discriminate against her based on her sex.  Docket No. 30-2 at 40 (Estes Dep. 70:9-17).  Thus, because Dr. McCluskey played no part in Ms. Long's decision to review Ben Murphy's classification decision or in Mr. Stewart's reclassification to GS-14, and plaintiff testified that Dr. McCluskey did not discriminate against her based on her sex, the Court finds that any

evidence related to Dr. McCluskey and his treatment of other employees is insufficient to establish pretext. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1268 (10th Cir. 2007) (noting that plaintiff's comments about the previous manager's "hurt feelings are immaterial as [the previous manager] was not the decision-maker in this case and nothing of record indicates he influenced the decision in any way") (citation omitted); *cf. Rivera*, 365 F.3d at 922 (noting that "[c]omparison of one disciplinary action with another ordinarily is relevant only to show the bias of the person who decided upon the disciplinary action").

### d.  Summary

Ms. Estes fails to raise any genuine inconsistencies, incoherencies, or contradictions with defendant's legitimate nondiscriminatory compensation decisions and no reasonable jury could conclude that defendant's compensation decision was intentionally discriminatory. *Johnson*, 594 F.3d at 1210.  Accordingly, defendant is entitled to summary judgment on plaintiff's wage discrimination claim. *Id*.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 30] is **GRANTED**.  It is further

**ORDERED** that the Trial Preparation Conference scheduled for September 23, 2013 and the trial set for October 8, 2013 are **VACATED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed in its entirety.


DATED September 17, 2013.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge